First, I'd like to say I've worked 30 years for the railroad and I have a little hearing disability, just tiny. And if when my opponent speaks, if you could just turn the volume up, if there is a volume, I'd appreciate it. Good morning. Thank you for the honor and the humbling experience of appearing before you as a pro se plaintiff with an environmental issue. I'd like to give a little bit of context to show that this is an important issue. In February 2003, high water washed out an embankment between the Smith and Bybee Lake system and the Columbia Slough. And it also opened up a lot of issues. It opened up the breach between Smith and Bybee Lakes and the Columbia Slough and opened up a lot of other issues. And in North Portland, an environmental issue is not a tree hugging experience. It's rather a matter of life and death. And the filling of the washout was no different. People will die as a result of Judge Hogan's decision. Now, that's the kind of histrionics the poor hope to avoid by bootstrapping the filling of the 2003 washout to the consent decree finalized in 2001. The filling of the washout was obviously never considered by the consent decree since it was finalized two years earlier. By using the consent decree, no public notice nor public opportunity to comment would be allowed. And the reason consideration of the effects of filling the washout would not be considered. That was the purpose for using the settlement decree. It's my hope that the reason consideration Congress mandated for filling of waters in the United States would become the outcome of this proceeding. The entire record would show that experts predicted opening up the lakes of the slough in exact same location as the washout would flush the lakes with tides and keep the pollutions from building up. On the other side, while the washout was open, it was amazing how clear the lakes and the Columbia Slough became. I was the pro se plaintiff in the consent decree the Port wanted to use, Port Anchor, wanted to use to allow filling of the washout. And they wanted to do that with the use of a nationwide permit number 32, which is a permit that accompanies consent decrees. The Supreme Court decided in Hogan versus Guardian Life that district courts have limited jurisdiction in resolving the concerning consent decrees. Judge DeSema's opinion in Hagestad versus Trageser amplified that decision with the quotation. Without a violation, the court's order, there is no jurisdiction. Judge Hogan simply didn't have jurisdiction to reopen the case or to change the consent decrees or to decide before the Court of Engineers that the nationwide permit 32. What is your authority for saying he had no jurisdiction? Didn't the court maintain some supervisory role in the consent decree? It did, but the fact that he maintained that supervisory role doesn't give doesn't give supplemental jurisdiction. Only a violation. And I believe that's what Judge DeSema said. It's only a violation of that consent decree gives it jurisdiction. Previously, the Ninth Circuit believed there was some kind of free ranging authority to get involved in consent decrees and so on. But I think Kokanen, Judge Correa's opinion, took that away. And and since that opinion, what would be the alternative? If you have a washout in a in a fill in a field or area where the buildup that the thing that was washed out had been artificially built by fill material. Well, here's what you do is you get a permit to fill it. The consent decree, my court action had nothing to do with the washout. The washout occurred two years later. You get a permit. Or you're appealing now as a result of what happened after the washout. Well, no, I'm not. What I'm appealing now is Judge Hogan's decision that when when the poor decided they wanted to use that nationwide 32, they weren't so sure of themselves. So they sought an advisory opinion from Judge Hogan. And they and they reopened the consent decree without any any harm on my part. You had notice of the hearing and you were I had I had on telephone here. I had I had a notice of the motion and and a hearing all within 16 days. And but but here is the point is that Judge Hogan shouldn't have been involved. We should have used the force majeure provisions in the consent decree. We should have. They should have contacted me. We had resolution ways to resolve issues in a consent decree, but they didn't want to do that. The the washout had nothing to do with the consent decree. It happened. It was a force majeure maybe. And then it could have been applied to consent decree. But here's the problem. When it happened is a very significant event and filling had very significant results. And the only way to fill it then was to go to the Corps of Engineers and get a permit, not to try to bootstrap some other issue, other action that just happened to be in the same area. I mean, there's but I'm I'm pretty sure that we're up. Why haven't I made no failure? I'm part of the consent decree. Then then for him to change it, open it up, change it, make a decision is wrong because it's wrong for another reason. Because at that time, the Corps had not made a decision, even on the on the thirty two permit number thirty two. And I am asking that you vacate. All I'm asking is you vacate Judge Hogan's ruling and inform an equitable remedy for the damage. Judge Hogan caused when he usurped the normal 404 process in a way that closed all normal routes of participation by the public. Once he made that decision, we're through except in this very body. Oh, where does that leave us in practical terms? What is it physically to be done at this point? Well, it's Phil. I mean, is there anything that we can do? Well, yeah, you can remove the film or what I ask is let's let's just do what the basic power of the Clean Water Act is simply to think about, to reason, to discuss what you when you're going to fill waters, United States. That didn't happen. And it should have happened because had it happened, there was the the film would never have been placed. And but I'm not asking you to remove the film, except that a permit cannot be obtained. And and I don't know. I'm asking you to first vacate Judge Hogan's decision because he didn't have the authority. And second, to do whatever you can. It's an equitable court to bring about a real 404 permit consideration for a court to tell the Columbia River what to do is pretty much like King Canute. I'm sorry. The history of the Columbia River doesn't lend itself to courts telling it what to do very much. Well, it goes where it pleases. This is a Columbia. So you're old enough to remember the Vanport flood and a few. Yeah. So I do remember Vanport. Well, the Columbia River isn't doesn't pay much attention to consent decrees. It does what it's going to do anyway. Well, it did. And then washed out a washout. The washout was so important because it disconnected the lakes from the landfill. You want them to do. Put a cover covered in as part of the repair of the fill. That's what I asked. Put a big tube through there so you could exchange water back and forth. That's what I asked for. But but I'm not asking you to make that decision. I'm saying the decision should be returned to the Corps. Yeah. I'm just saying it should be returned to the Corps and Judge Hogan shouldn't have made it. Well, the Corps did participate in this. The Corps of Engineers did participate in this hearing, didn't it? Yes, they did. But up until the moment of the hearing, nobody had any idea what that. Now, maybe the port did, but because they seem to be joined at the hip. But previously, just immediately previously to the hearing, the Corps offered two hundred and forty five thousand dollars to put in a tide gate to the port. And that was the first indication I had that that wasn't what wasn't going to happen is when the port turned it down. Thank you. Thank you. We'll hear from Abilene. Good morning, Your Honors. May it please the court. My name is Lori Beal and I'm here on behalf of the court. A little bit louder for the benefit of all of us. OK. Is that better? I'm here on behalf of the port of Portland. I was planning to argue for 10 minutes and leave 10 minutes for Mr. Key, who is here on behalf of the United States. The port believes that Mr. Jones appeals should be rejected for three reasons. First, he's not shown that the order he appeals from is final. Second, another jurisdictional problem. Mr. Jones has not shown that he has standing to challenge the consent decree between the port and the United States, which is the operative document for purposes of his Clean Water Act claims. Finally, on the merits, Mr. Jones has shown no error in the district court's interpretation of his consent decree. Before I elaborate on these three points, I'd like to give you a little bit of background. This is one of a number of lawsuits that Mr. Jones has brought against the port and various federal agencies, and this particular suit concerns development activities that have occurred in the Rivergate area of Portland over a period of many decades. Rather than undertake prolonged litigation, the port chose to settle Mr. Jones' claims, but it expressly did not assume any liability in doing so. In formulating the settlement, the parties felt that it would be most appropriate for the Corps of Engineers to have oversight authority over mitigation that the port was proposing, and to effectuate that, the Corps brought an enforcement cross-claim against the port, and the parties then entered into two separate settlement decrees, consent decrees, one between Mr. Jones and the port, and then a second between the port and the United States. I refer to that as the enforcement consent decree, and Mr. Jones is not a party to the enforcement consent decree. The consent decrees are not identical, but they do contain the same mitigation requirements, and those were quite extensively negotiated. This was actually a complicated process because it involved not only the parties, but a number of other regulatory and resource agencies that have authority over the Rivergate area, in particular the city of Portland and Portland Metro, which manages the lakes area that's at issue here. Now, one of the specific items of mitigation Mr. Jones sought in those negotiations was construction of a tide gate that would connect the Columbia Slough with Bybee Lake, and this proposal was strongly opposed by the city and Metro. So ultimately, the parties agreed to construction of a bridge. Why were they opposed to it? Just morbid curiosity on my part. Yeah, my understanding, Metro manages the lakes, and there is some sort of water control structure, so they actually manage the levels of the lakes, and I don't know their management objectives in doing that, but that would be quite a change in how they manage. I believe that it's open to the slough at the north, and it does have water that comes in and then underground water. Does that answer your question as best as I can? And as far as the city goes, I don't know their reasons, but they wanted to leave the situation the way it was with the bank. Anyway, so that plan was rejected. The parties decided to go ahead with the bank project, and then, as Mr. Jones has said, there was a washout, and this meant that the port couldn't complete its obligations. So there was another round of discussions, and Mr. Jones again renewed his position that he would like a tide gate there. The city and Metro renewed their opposition, and ultimately, there was general agreement, except for Mr. Jones, that the port should repair this breach and then complete the trail. And then because Mr. Jones had threatened to sue the port if it did that, the port went back to the district court and asked for a determination whether that repair work would be within the scope of the consent decrees. The court said that it was, and then the port went ahead and completed the repair and completed the trail, I believe, at the end of the summer of 2003. So that's the decision that Mr. Jones challenges, and the first issue we've raised is whether that is the final order for purposes of 28 U.S.C. 1291. Generally, in the post-judgment context, courts have applied a practical approach, and one of the things they look to is whether there will be some sort of more final disposition, so to speak, that would be an appropriate basis for a comprehensive appellate review. And the intent, of course, is to avoid a series of separate appeals. Here, the consent decrees do contemplate a final ruling. They provide that the port is to bring a motion to terminate the decrees after it's completed all of the mitigation. So in the circumstances here, we have what I would refer to as an interim order addressing one item of mitigation, and there will later be a more comprehensive order stating whether or not the port has discharged all of its obligations, and that would seem to provide an appropriate basis for a review. So you said that if you get to the end of the road and the district court says, okay, everything's been taken care of, then at that point you can go back and reexamine all that's happened before? It would seem to me that it would be appropriate for Mr. Jones to argue that any particular item of mitigation was not in compliance with his consent decree at that point. The work has been done here, so that sort of takes away the urgency or some need for an immediate appeal from our perspective. Does the port have a position on whether the Jones consent decree authorizes the action of the port? Yes, it does. So he does have standing under his decree that the dichotomy between the two consent decrees doesn't affect his standing? Exactly. The second point, that was my second point, was the other jurisdictional issue. Mr. Jones, by design, was not a party to the enforcement consent decree, and only an action brought by the United States can implicate the Clean Water Act issues that he is concerned about. That is, whether or not this nationwide permit may apply. So by virtue of the Jones consent decree standing alone, there is no permitting authority one way or the other. Mr. Jones, we believe that that's a separate issue. Whether or not this this modification of the consent decree complied with the NWP 32, right? That's a different issue. I don't believe that issue. My position would be that that issue was never before the district court. What the district court said or what the port asked the district court to determine was, is this repair work consistent with the consent decrees and the terms of the consent decrees? With respect to this particular item of mitigation, that is, construction of the trail, where it was to be built, how it was to be built. Those conditions are identical in the two consent decrees. Let me ask the question the other way. Was during the course of these proceedings to modify the consent decree, either decree, was any question raised about compliance with the nationwide permit? Was it was any issue raised in the district court? It was discussed in the context that the consent decrees, the Jones consent decree, has provisions saying something to the effect that the parties acknowledge that work necessary to be done to fulfill the obligations of the consent decree are covered under Nationwide Permit 32. So it was discussed and acknowledged, but I don't believe the issue of whether that permit appropriately applied was before the court. That's a Clean Water Act claim. There was no underlying Clean Water Act claim. The question was, does this language in the consent decree allow the port to do the repair? And that would be my final point. To the extent there is a final order, Mr. Jones would be entitled, I believe, to appeal whether the repair work was consistent with his consent decree, pursuant to the language and intent of that decree. And what the decree states is that the port may place base fill area in the buffers along the slough for purposes of trail construction, and that is exactly what the port did here. He's raised one issue, one interpretive issue, and that relates to language in the decree stating that the fill should not exceed three feet above native soils. Well, first, he didn't actually raise that issue properly below in his response brief, so it wasn't fully addressed. But second, on the merits, our position would be that that interpretation, if I understand it correctly, is that the port would have to construct the trail underwater, and clearly the parties did not intend that to be the case. So as a matter of interpretation, the three-foot requirement, we believe, was intended to refer to native soils that existed at the time the consent decrees were entered into. So in conclusion, Your Honors, if the court does find that the order is appropriate for disposition, we would ask that the district court's decision be affirmed. Mr. Jones has gotten here exactly what he bargained for, which is this pedestrian trail along the bank of the Columbia Slough. If you have no further questions, I will let Ms. Durkee go ahead. You're sharing time with the government? Yes. Hello. My name is Ellen Durkee. I'm from the U.S. Department of Justice, and I represent the court in this matter. I tend to look at this case as a fairly simple one. The result here, I mean, really the only issue that the district court was asked to address was whether filling this washout area was contemplated by the consent decrees, and the court correctly concluded that it is. The result here is exactly what was contemplated by the consent decrees, which is that there was a removal of fill adjacent to the area of the trails and a creation of this trailway area. What was not contemplated by the consent decrees was to have an open channel between Bybee Lake and the Columbia Slough, and whatever the environmental benefits are not of creating that, the consent decrees didn't provide for that. What it provided for was to have a trail based on fill through this area. Now, the only other point I'd like to make here in terms of the question about Nationwide Permit 32 and how that plays into it, the way I see the issue is this. One of the conditions of Nationwide Permit is that it is part of the mitigation work as part of consent decree, and Judge Hogan was simply asked to make the determination on that legal issue. Beyond that, there are other terms and conditions of Nationwide Permit 32, which the district, which the court then processed through, and it took a couple more months like the Endangered Species Act consultation, and there's all sorts of soil erosion conditions and so on and so forth, but I don't see those as being a source of the disagreement between the parties. I think the disagreement is simply centered on that first preliminary step into Nationwide Permit 32, which is whether they were contemplated by the consent decree or fall under the terms of the consent decree, and certainly Judge Hogan had jurisdiction to decide that by the terms of consent decrees themselves, and it is a legal issue, which he's certainly capable of making the decision on. I don't want to take up the court's time. If the court has no other questions. One question. Contemplated by the consent decree, the consent decree was designed to accomplish certain things based on the conditions as the court and the parties then found them. The river intervenes, and there's this washout. Was there a fill? This area had previously been filled prior to the consent decree, so the consent decree was not focused on what is the effect of filling this particular area. Is that correct? When the original consent decree was negotiated and entered by the district court, it wasn't going to call for filling in this area to create a trail. Is that correct? Actually, the consent decree has fairly broad language because there had to be fill placed in order to build a base for the trail, so the consent decrees actually say that what is authorized is the placement of fill to provide an appropriate base for the trail. It also provides in this particular area, the Leadbetter Peninsula, for removal of fill on areas on either side of the trail. So it actually, the way I read it, is a fairly general authorization to do whatever movement, either removal or placement as needed to create, you know, a trail that goes through, a bicycle recreational trail, with removal on, you know, it's a fairly narrow trail, but removal on either side to create sloughs and sort of wetland areas as part of the mitigation. So I think the consent decrees provide authority to do the movement whatever direction is needed to create this result. Did the consent decree and the activity taken to comply with it involve closing a channel that was open at that point? No. At the time, the consent decrees were, at that point, there was no channel there. I don't know historically if there was a channel there or not. Mr. Jones says there was, and I assume he knows, certainly knows better than I. But at the time that the consent decrees were entered into, there was no water passage, as I understand it, at that point. So the consent decree and the process of entering into it, negotiating, there really wasn't contemplation or consideration of the impact of closing a channel at that point? No, there was no consideration because there wasn't a channel there. I mean, I'm told it was discussed and that was something that was determined would not happen. That is the creation of a channel there. The consent decree, I mean, Mr. Jones may have wanted a channel or a culvert or something there. The other parties opposed it. That did not become part of the decree. The river speaks its own mind. Stage two, there is a channel there. Doesn't that pose a somewhat different question than the consent decree was addressing? Well, I think not because it's a movement, it's a topography movement. And as I said, I think the consent decrees gave broad authority to make the movement of fill to create a result. And what the port was irresponsible. But the result was the filling in the channel. I mean, you told me the consent decree did not contemplate filling in a channel. That's the result of the action being taken now purportedly in order to satisfy the consent decree. But the consent decree wasn't aimed at that. The consent decree was aimed at getting the result that is there now, which is the creation of a trail through the system and removal of fill on either side of the trail. Well, I think there's something different between molding the land where there's already solid land between these two bodies of water and then the situation which the so-called modification or the effectuate consent decree order spoke to was one where there wasn't a blockage all the way between these two bodies of water and one is being installed. Now, if in the first instance you'd come upon that situation, you would be thinking about the considerations, I think, somewhat differently than you would if you already had solid land between these two bodies of water. And the challenge being raised, as I understand it, Mr. Jones, is whether those different considerations ought to have been contemplated in the way that you would have had to have done in the beginning, if that's the situation you were facing. I can't even understand that question, so I don't expect you to. It seems to me the situation is somewhat different than that that was contemplated by what the parties negotiated in the consent decree. Does that affect the court's power to accomplish that result under the vehicle of the consent decree? Well, our position is it does not affect its power, that I think the court rightly focused on the result that the court had to accomplish, not necessarily on, you know, what erosion may have created in terms of the start position for the construction by the time they were actually doing it. Does the consent decree specifically address the question of maintenance of existing pedestrian trail or path or whatever? Is there any maintenance in the consent decree? I don't recall that there is anything like that, that obligates the port to maintain the trail. I mean, I think that, and I don't know if I recall it from the consent decree, I mean, I think there's some contemplation down the line that the trail may be turned over to a different governmental authority. I just wanted to answer the question that was asked, why does Metro oppose that? It's a very good question. The reason is, is Metro has problems with the landfill, and they need to mix the leachate from the landfill with Smith and Bybee Lakes in order to meet state water quality. And the washout ended that. It made it so the lakes were almost independent from the water body that passes the landfill. I know it's kind of complicated. And I think it's a good question because it's a question we run into in the North Portland all the time. It's doesn't the city and Metro have the best interests of the people in North Portland in mind? And the answer is no. And whenever they cannot have a decision and not ever give notice to what's being decided, that decision helps them do the wrong thing. And I'm just, the other thing about, I did raise the issue of the three-foot limit on fill above native soils. We had days of discussion about they wanted me to accept the level, some certain elevation. And I said, no, it's got to be native soil. And it was a doorknob issue. I mean, I didn't get it until I was turning the doorknob to leave. And so to say it wasn't important was a very important issue. And the main question is, was the effects of this very significant changing the water hydrology of everything ever considered? And wasn't that the intention of the Clean Water Act? And isn't this use of a nationwide permit a violation of Congress's intention that fills be considered? We thank the parties for the argument. The case is submitted. We will take a brief recess before we continue the morning's calendar.
judges: Goodwin, Tashima, Clifton